**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| ──────────────────── | ) | |
| **UNITED STATES OF AMERICA** | ) | **NO. 3:15 CR001 (JAM)** |
| | ) | |
| **VS.** | ) | |
| | ) | |
| **IAN BICK** | ) | **SEPTEMBER 15, 2016** |
| **Defendant** | ) | |
| ──────────────────── | ) | |

**SENTENCING MEMORANDUM OF IAN BICK**

Jonathan J. Einhorn
129 Whitney Avenue
New Haven, CT. 06510
203-777-3777
einhornlawoffice@gmail.com

*Counsel for Defendant Ian Bick*

1

I.    **INTRODUCTION**

Ian Bick should not be incarcerated for the crimes for which he was found guilty. There are alternative measures, such as probation or house arrest, which would be appropriate for him, rather than placing him in an already over-burdened prison population. He was found guilty of a non-violent economic crime, allegedly committed when he was 17 and 18 years old, still a child, his brain not fully matured (See Section IX, C, *infra*). His victims are largely adults who were seeking usurious interest rates in loaning him money. He has no criminal history and has never been incarcerated. The loss is less than $250,000.00, and as argued *infra*, the Guidelines are especially Draconian as to fraud losses. Ian has also taken a second job (at Whole Foods), devoting his entire earnings to restitution.[1]

The prior business ("Tuxedo Junction") was transferred on July 1, 2016 for no consideration, and Ian still works there as a second job doing marketing. He has not yet been paid for his efforts in that regard. His business, The Youth, LLC has been dissolved (see Exhibit A attached), and its bank accounts closed. Its tax permits have been surrendered.

The main contributor to over-incarceration is that too many people like Ian are sentenced to prison in the first place. There are better and more humane ways to handle sentencing. Speaking before the American Bar Association a dozen years ago, Justice Anthony M. Kennedy spoke about the vital importance of

---

[1] Defense Counsel has been collecting restitution funds from Ian and his family to be paid at sentencing.

"bridg[ing] the gap between proper skepticism about rehabilitation on the one hand and improper refusal to acknowledge that the more than two million inmates in the United States are human beings whose minds and spirits we must try and reach".

In 2013, there were more than 2,200,000 adults incarcerated in the United States, an average of about 1 out of every 100 citizens.[2] The average annual cost of incarcerating a federal prisoner in 2014 was $30,619.85.[3]

Indeed, probation is a sentence in and of itself, and ought to be used as an alternative to incarceration for Ian. See U.S.S.G. §5B1.1, Intro. Comm. (citing 18 U.S.C. 3561. Probation metes out significant punishment; "[o]ffenders on probation are…subject to several standard conditions that substantially restrict their liberty", including travel and employment restrictions, regular reporting, permitting unannounced visits to their home, restrictions on associating with certain individuals, and in many cases, substance abuse monitoring. *Gall v. United States,* 552 U.S. 38, 48-49 (2007).[4]

Moreover it is unfair to compute Ian's Guideline's Range until the U.S. Attorney has determined whether or not he will be re-tried on the four counts on which the jury was

---

[2] Correctional Populations in the United States, 2013 (NCJ 248479). Published December 2014 by U.S. Bureau of Justice Statistics (BJS). By Lauren E. Glaze and Danielle Kaeble, BJS statisticians. See page 1 "highlights" section for the "1 in ..." numbers. See table 1 on page 2 for adult numbers. See table 5 on page 6 for male and female numbers. See appendix table 5 on page 13, for "Estimated number of persons supervised by adult correctional systems, by correctional status, 2000–2013." See appendix table 2: "Inmates held in custody in state or federal prisons or in local jails, 2000 and 2012–2013".

[3] *Annual Determination of Average Cost of Incarceration*, Fed. Bureau of Prisons (March 9, 2015), available at http:www.federalregister.gov/articles/2015-05437/annual-determination-of-average-cost-of-incarceration.

[4] Kate Stith& Jose A. Cabranes, Fear of Judging: Sentencing Guidelines in the Federal Courts 62 (1998) ("While before the Guidelines nearly 50% of federal defendants were sentenced to probation alone, that figure is now less than 15%").

deadlocked. Specifically, should Ian be sentenced on this verdict and then re-tried and convicted on the mistried counts, he would not receive the benefit of "grouping" in computing his Guidelines Range. (See section X, *infra*). Grouping essentially consolidates all counts of related crimes on which a defendant has been convicted, but in a second trial, he would not be eligible for that Guidelines procedure. Ian's sentencing should be deferred until the Government has indicated whether or not it will re-try him on the mistried counts.

Ian's co-conspirator John Wrobel, was never incarcerated, and pled guilty to a misdemeanor in state court, after lying to the State Banking Commissioner. His culpability in this federal case was well-documented during trial.

In short, Ian Bick seeks a sentence of probation for the crimes on which he has been convicted, or at the least to defer sentencing until a decision is made as to the "hung" counts.

## II.    SUMMARY RESPONSE TO GOVERNMENT'S SENTENCING ARGUMENTS

The Court in Docket Entry 158 ordered the Government to file its Sentencing Memorandum first, which includes their claim as to loss and victims.[5]   Ian Bick responds, in this summary, to the various issues raised in the Government brief. The Government seeks an upward departure for reasons exaggerating the nature of Ian's past and present conduct, but will be obviously be limited by the requirements of §3553(a).

A.  The Government claims the loss amount is $495,886.00.[6] This includes lenders who were paid back (e.g., Eric Browndorf, as to the $5,000 claimed), which a diligent inquiry would have revealed. (See section III, *infra*). This figure also

---

[5] The Government recapitulates the evidence at trial in its memo. Ian will not respond to this narrative, except where it is relevant to sentencing.

[6] See Attachment A to the Government's Sentencing Memoranda, Docket Entry 160-1.

includes $221,000 attributable to Henry Scozzafava; this ignores the jury mistrial as to the Indictment relating to him, presumably because it was not clear to members of the jury whether Henry invested his money as part of the music business or as part of the government's alleged fraud scheme. It also includes $6,000 for Anastasia Osdranus, where the evidence pertaining to her indicates that she was an investor in the music venue and her investment was unrelated to the fraud charged.

The Government's loss schedule incredibly includes $10,251.00 for Jake and Martin Mallow, for alleged conduct they admit occurred <u>long after</u> the jury verdict. Moreover, as will be discussed infra, the Mallows rented the concert facility, and in the end, did not lose any money. They were not fraud victims.

Finally, the Government includes numerous persons as "victims" who never testified at trial, and details their claimed involvement with Ian. A *Fatico* Hearing is appropriate under all of these circumstances. It is believed that the loss amount is  under $250,000.

B. For similar reasons, Ian denies that there were 27 victims, but agrees that there were 10 or more victims.

C. The Government claims several times in its sentencing memo that Ian has shown no remorse for his conduct. Apparently the Government has forgotten that Ian denies that his conduct was contrary to law, went to trial, and will likely appeal the outcome of the trial. Ian maintains his innocence. He cannot consistently deny the charges and be remorseful for them. The Government's position is untenable.

D. Probation recommends a Guidelines Range of 63-78 months (PSR at ¶70). The

Government seeks a two level enhancement for sophisticated means, raising the Guidelines Range to 78-97 months. This enhancement is not appropriate here for reasons set forth *infra.*

E. The Government seeks an upward departure on claims that Ian violated the conditions of his release with regard to the hiring of an accountant and missing probation interviews. Ian denies these allegations of post-conviction conduct. (Government Memo, p. 57). While Ian rescheduled several meetings with the probation officer due to conflicts and transportation issues (he does not have a driver's license or own a car), he never missed an interview.

F. It is claimed that Ian continues to engage in "illegal conduct". This is not so: various people have recently invested in his music shows; whether or not the events were successful does not constitute fraud.

G. Although not relevant to sentencing, the Government claims that Ian did not engage the services of an accountant for his business, Tuxedo Junction, in violation of the Order at Docket Entry #111. This is incorrect; the Court's order was only to require Ian's accountant to cooperate with the probation office. It did not require Ian to hire an account and neither Ian nor Tuxedo Junction ever engaged the services of an accountant except for during a short time in December, 2016. He could not afford the services of an accountant.

H. The Government apparently (at pp. 57-58 of its Memo), seeks an upward departure based upon "post-conviction conduct, "specifically traveling to New York to gamble rather than working to pay money to the large restitution order". Ian's conduct in traveling to New York as described was just poor judgment,

6

maybe attributable to his immaturity, but certainly is something for which he is

remorseful, and perhaps indicates the need for some type of counseling.


### III.    VICTIMS/LOSS

The Government claims that the loss is $495,886.00[7] and that there are 27 victims. That

sum includes loss amounts attributed to 13 persons who testified at trial and 12 who did not,

including one "victim" who was not even involved with Ian until well after the verdict. Pursuant

to Guidelines §2B1(b)(1)(G), if the loss is between $250,000 and $550,000, 12 offense levels

would be added. A two level increase would be added under §2B1.1(b)((2)(A) if there are more

than 10 victims[8].

Ian Bick disagrees with the Government's calculations and would request a *Fatico*

hearing on loss which Ian believes is less than $250,000.00.

Specifically addressing the calculations set forth in Attachment A:

A. **Eric Browndorf** should not be listed as a victim, as he was repaid.

B. **Anastasia Ostramus** should not be listed as a victim, as her monies were as an

investor into Tuxedo Junction. She is still a partial owner of the company.

C. **Henry Scozzafava** should not be listed as a victim, as his was an investment into a

series of concerts, which did not yield a profit. The jury was deadlocked on all four

counts relating to him, (Counts 1, 3, 4, and 13) indicating that there was a question

---

[7] See Attachment A to Government Sentencing Memo, Docket Entry 160-1.

[8] The Government claims that each family member or member of a married couple should be added as a victim, but cannot cite a Second Circuit case for this proposition. It does cite cases from the 7th and 11th Circuits, none of which constitute the law in this Circuit. Nonetheless, Ian agrees that there are at least 10 victims.

about whether or not he was defrauded or just made an investment that did not yield the hoped-for return.

D. The jury found Ian "Not Guilty" of the $20,000 fraud allegations in Count 2 of the Indictment as to **Robert Burke and Rosemary Burke**, and that should not be counted as loss;

E. The jury found Ian "Not Guilty" of the $5,975 fraud allegations in Count 8 of the Indictment as to **Geovanny Melendez**, and that should not be counted as loss.

F. **Jake Mallow/Martin Mallow** should not be included in the loss list as their involvement with Ian Bick occurred months after the verdict and they did not lose any of their investment or concert facility rental. They are not "victims".

G. The addition of **Barbara Lichtman** to Attachment A for a $10,000 loss should not be counted, as that amount was repaid.

H. **The remaining eight "victims" in Attachment A**, who did not attend trial should also not be counted, as there was no ability to cross-examine any of them, and there is an issue as to which of them actually are seeking repayment.

## IV.    OBSTRUCTION ENHANCEMENT

The PSR recommends a two level enhancement for Obstruction of Justice pursuant to USSG §3C1.1 at ¶ 18-21, essentially citing three different obstruction claims.

The first obstruction claim in the PSR is at ¶18 where the simple claim is that Ian perjured himself by testifying at trial that "many" of the victims simply didn't ask about the use of their money and "only "cared about the "interest rate".[9]

---

[9] The PSR's statement at ¶ 18 is that "Mr. Bick perjured himself during trial when he testified.

Actually, this is consistent with the testimony of several witnesses, who testified that all they were concerned about was the high interest rate (50%), offered by Ian. And even though the jury found him guilty as to 6 counts of the Indictment, apparently they found him credible on other counts as they did not return guilty verdicts on 7 counts of the Indictment.

The second obstruction claim of the PSR, at ¶19-21, is that Ian wrote on certain checks after they were subpoened, writing "Artist Deposits for concerts" on checks, in an effort to show that "70-80% of the money had been spent on artist deposits" (Indictment, Count 15).

However, the jury returned a verdict of Not Guilty as this Count of Indictment and it cannot now become the basis for an obstruction enhancement.

The third basis for an obstruction enhancement in the PSR appears to be found in ¶28 but not discussed in detail earlier as with the other two obstruction claims. It appears that the PSR would argue that Ian "unlawfully influenced a witness" in suggesting false testimony to John Wrobel, before the State Banking Commission. Again, this claim is based solely upon the uncorroborated testimony of John Wrobel, a convicted perjuror. (In any event, query whether Wroble's testimony in that regard was material).

In order for the obstruction enhancement to be applicable, it must be found that Ian Bick perjured himself while testifying. The increase cannot be used to punish a defendant for testifying, or for testifying to facts which a jury subsequently disbelieved, or as here, believed (contrary to the Government's losing argument).

As recently discussed in *U.S. v. Thompson*, #14-2267, (2d Cir, 12/9/2015), (copy attached), to apply the objection enhancement, a Court must apply the federal criminal perjury statute, 18 USC §1621, which is violated if

> [a] witness testifying under oath or affirmation…gives false testimony concerning
> a material matter with the willful intent to provide false testimony, rather than as a

result of confusion, mistake or faulty memory.

The Second Circuit noted at p. 9, that "the court must find that that the defendant consciously acted with the purpose of obstructing justice", (citing *U.S. v. Zangari*, 111F.3d 307, 329 (2d Cir 1997).

## V.     ROLE IN THE OFFENSE

The PSR recommends a two level enhancement for Ian's Role in the Offense pursuant to USSG §3B1.1 at ¶27, arguing that Ian was a leader, manager or organizer, over the co-conspirator, John Wrobel. Mr. Wrobel pled guilty to perjury in state court, for lying to the Connecticut Department of Banking. The claim that Ian "managed" or "led" John Wrobel comes only from the uncorroborated testimony of this admitted perjurer. Clearly, Wrobel left his association with Ian early in the "conspiracy, but that doesn't make Bick his leader or manager. Ian may have been more aggressive in seeking lendors, but again, that doesn't make him Wrobel's leader or manager. Wrobel had his role in the conspiracy, which was different than that of Ian Bick.

Nonetheless, the government must prove this aggravating role in the offense by a preponderance of the evidence. *United States v. Brinkworth*, 68 F.3d 633, 641 (2d Cir. 1995).

## VI.     SOPHISTICATED MEANS

Although not recommended by the Probation Office, the Government seeks a two level enhancement for Sophisticated Means pursuant to Guidelines §2B1(b)(10)(c) which is applicable if "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means". Sophisticated means is defined a s "especially complex or especially intricate offense conduct pertaining to the execution or

concealment of an offense" (Guidelines §2B1.1 app n. 9(B)).

The evidence is this case is that the mechanics of the alleged fraud was very simple: Ian consulted with a reputable attorney who advised him to utilize a document characterizing the moneys from friends as "loans" and he drafted a loan document.  Lendors would then sign a loan document. There is nothing complex or intricate about those logistics.

The Government makes a remarkable claim about shell corporations, obviously misunderstanding the facts of the various transactions. There were no "shell" corporations: Ian had several corporations relating to several businesses. By way of a reminder, W& B Wholesale was the initial company into which loans were made which was changed, by name change only, into W & B Investments.  This is Where It's At Entertainment was the original structure for Ian's initial concerts, and it too had its name changed to Planet Youth Entertainment. The Youth, LLC is the d/b/a for Tuxedo Junction, his concert locale. There is no testimony that Ian would "use" his father's business, Some Things Fishy Catering to deceive any "victim".  Sometimes payments were made using his father's credit card account and turned over to Ian and Wrobel.

An attorney was used for a legitimate purpose, to wit, to draft the appropriate loan documents and to advise Ian on the use of loans. There is no trial testimony that any "victim" was deceived by a statement from Ian about the use of an attorney. The use of an attorney here, was not evidence of "sophisticated means".

There were no falsified bank statements and the occasional bad check was not a "sophisticated means" or at least not a successful one. The Government's continued use of the so-called perjury to postal inspectors only shows their unwillingness to accept the jury's verdict of Not Guilty on that charge. It has no relation to and is not relevant to, the sophisticated means enhancement request. The Government's comparison of this case to the facts in *United States v.*

*Loles*, 6 Fed. Appx. 7 (2nd Cir 2015) is inappropriate.

Of course, when considering the sophisticated means enhancement issue, it must be recalled that Ian was between 17 and 18 at the time of the conduct set forth in the indictment and a high student or graduate, and the duration of that alleged illegal conduct was fairly short (about six months).

## VII.    GUIDELINES SUMMARY

Ian Bick agrees with the base offense level of 7 for his offense (U.S.S.G. §2B1.1(a)(1), see PSR ¶24. Pursuant to Application Note 2(C), where there are multiple counts, the count with the highest maximum term of imprisonment is used. The Sentencing Commission requires the grouping of wire fraud and money laundering where the fraud is the offense to which the money laundering funds were derived. See U.S.S.G. §2S1.1 comment (n.6).

A total of 10 additional points should be added under §2B1.1(b)(1) (F) and not the 12 additional points suggested for a loss between $250,000 and $550,000 under §2B1.1(b)(1)(G).

He also agrees with the one level enhancement under USSG §2S1.1(b)(2)(A) for a conviction under Count 14 for a violation of 18 USC §1957 (Money Laundering). Ian does not agree with an enhancement for sophisticated means, or for an enhancement for obstruction of justice. He should not receive the suggested two level enhancement for a leadership role in the offense.

The number of victims is unclear however Ian agrees that there are 10 or more victims, allowing for a two level enhancement under U.S.S.G. 2B1.1(b)(2)(A)(i). The Government's claim of 27 victims is opposed.

Using the proposed changes argued here, Ian Bick's offense level, (being in criminal

history category I, which is accurate), would be

| | |
|---|---|
| Base offense level: | 7 |
| 10 or more victims | 2 |
| Loss Amount: | +10 |
| Total Offense Level: | 19 |

which translates to a Guidelines Range of 30 to 37 months under Criminal History I. Ian seeks a sentence of probation, and not a sentence of incarceration.

We respectfully submit that the Court should depart downward significantly because the total offense level  - driven by the Guidelines' mechanistic focus on amount of loss and number of victims, rather than on the specific circumstances of this defendant and this offense—would grossly overstate the seriousness of the offense in this case.

In any event, after *United States v. Booker*, 543 U.S. 220 (2005), this Court has discretion, having considered the advisory Guidelines, to impose a non-Guidelines sentence. This Court's "considerable discretion" includes the discretion to vary from the advisory Guidelines range based solely on policy disagreement with the Guidelines, particularly where, as here, the governing Guideline is based on policy considerations rather than the Sentencing Commission's traditional role of applying empirical expertise.

Here, the non-Guidelines sentencing factors in 18 U.S.C. § 3553(a)—all of which must be considered along with the Guidelines—weigh heavily in favor of a non-Guidelines sentence significantly below the advisory range proposed in the PSR. First and foremost, Ian's age and immaturity strongly support a lenient sentence. Second, there is no realistic risk of recidivism given his lack of criminal history and the lessons he has painfully learned through this case. Third, the goal of rehabilitation would not be served by a term of incarceration that would prevent Ian from returning to be a productive member of society. Fourth, a lengthy prison sentence is not necessary as a deterrent to others, because the

defendants' trial and conviction have already had a significant deterrent effect. Fifth, the nature and circumstances of the offense, distinguish this case from the typical fraud conspiracy and justify leniency. In sum, Ian Bick respectfully submits that a non-Guidelines sentence of probation would be fair, just and appropriate under the circumstances of this case.

## VIII. SENTENCING ANALYSIS

The Supreme Court fundamentally altered the federal sentencing landscape in *United States v. Booker*, 543 U.S. 220 (2005), by making the Sentencing Guidelines advisory rather than mandatory to avoid violating a defendants Sixth Amendment right to a jury trial. *See Kimbrough v. United States*, 128 S. Ct. 558, 569-70 (2007). With this decision, the Court freed sentencing courts from the rigid, mechanistic framework that existed under the Sentencing Guidelines, replacing it with a system that provides judges the discretion to consider any relevant characteristic of an offense or of the particular defendant, with the goal of imposing a sentence sufficient, but not greater than necessary to accomplish the goals of sentencing. *Id.* at 570 (quoting 18 U.S.C. § 3553(a)). The Second Circuit has confirmed that

> *Booker* empowered district courts, not appellate courts and not the Sentencing Commission. . . . *Booker* breathes life into the authority of district court judges to engage in individualized sentencing within reason in applying the § 3553(a) factors to the criminal defendants that come before them.

*United States v. Jones*, 531 F.3d 163, 171 n.5 (2d Cir. 2008) (quoting *United States v. Vonner*, 516 F.3d 382, 392 (6th Cir. 2008) (en banc)). *Booker* thus returns sentencing courts to the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. *Gall v. United States*, 128 S. Ct.

586, 598 (2007) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).

The Supreme Court's recent post- *Booker* decisions have clarified the procedure a District court should follow in sentencing. First, a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. *Gall*, 128 S. Ct. at 596. The Guidelines are not the only consideration, however. *Id.* Indeed, the sentencing Court may not presume that the Guidelines range is reasonable. *Id.* at 596-97. Instead, the Courts mandate, after considering all of the sentencing factors enumerated under § 3553(a), is to impose a sentence sufficient, but not greater than necessary to serve the goals of sentencing. *Kimbrough*, 128 S. Ct. at 570. That sentence may be either inside or outside the Guidelines range. *Gall*, 128 S. Ct. at 597; *Kimbrough*, 128 S. Ct. at 570. It will be reviewed only for abuse of discretion. *Gall*, 128 S. Ct. at 597; *Jones*, 531 F.3d at 171 n.5, 174.

The Court may, indeed must, consider any and all information relating to the background, character and conduct of the defendant, in order to make an individualized assessment based on the facts presented. *Gall*, 128 S. Ct. at 597; *Jones*, 531 F.3d at 170, 172 n.6; *see* 18 U.S.C.§§ 3553(a)(1), 3661. Although the Court must consider the extent to which its sentence varies from the advisory Guidelines, and must explain its justification for the degree of any variance, *Gall*, 128 S. Ct. at 597, the Court need not cite extraordinary circumstances to justify a non-Guidelines sentence, *id.* at 595, nor must its justification be proportional to the extent of the variance. *Id.* at 595-96; *Jones*, 531 F.3d at 171. Either requirement would come too close to creating an impermissible presumption of unreasonableness for sentences outside the Guidelines range, *Gall*, 128 S. Ct. at 595; *Jones*, 531 F.3d at 171, thereby restoring the mandatory nature of the Guidelines that made them unconstitutional under the Sixth Amendment. *See Gall*, 128 S.Ct. at 595-96; *Booker, 543* U.S. at 233-35.

In considering the § 3553(a) factors, sentencing courts should give no greater weight to the Guidelines calculation than any of the other factors. *See Gall*, 128 S. Ct. at 600 (holding that the district court quite reasonably attached great weight to defendants voluntary withdrawal from the conspiracy, a non-Guidelines factor); *Kimbrough*, 128 S. Ct. at 570 (though § 3553(a) still requires a court to give respectful consideration to the Guidelines, *Booker* permits the court to tailor the sentence in light of other statutory concerns as well) (citations omitted). The Court has discretion to vary from the Guidelines based solely on policy considerations, including disagreement with the Guidelines. *Kimbrough*, 128 S. Ct. at 570. Indeed, where the relevant guideline is based on the Sentencing Commissions evaluation of policy considerations rather than empirical data, the Court may, within its discretion, conclude that the Guidelines yield a sentence greater than necessary to achieve §3553(a)s purposes.   *Id.* at 575; *accord Jones*, 531 F.3d at 172-73 & n.7, 179-80; *United States v. Regalado*, 518 F.3d 143, 146 (2d Cir. 2008) (per curiam). Where a court concludes that either of two different sentences would be sufficient to serve the sentencing goals of §3553(a), it may not impose the higher one. *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006). For the reasons set forth below, the Court should exercise its discretion to impose a non- Guidelines sentence well below the Guidelines range proposed in the PSR in this case.

**IX**.    **SENTENCING ARGUMENTS**

### A.  A Number of Objections to the Presentence Report Remain Unresolved

Under Federal Rule of Criminal Procedure §32(i)(3)(B), the Court must resolve all objections to the PSR, unless the Court rules that resolution of a particular dispute is unnecessary because it will not affect sentencing. Even for matters that will not affect sentencing, accuracy of the Presentence Report is important, because other government agencies rely on it. We thus respectfully request that the Court resolve all unresolved objections to the Presentence Report.

Because the PSR and Objections thereto are not public documents, Local Rule §32(i), we do not reproduce the objections here, but rather incorporate by reference the Objections submitted to the Probation Office.

### B.   The Court Must Consider All of the Factors Set Forth in 18 U.S.C.§3553a in a Holistic Manner When Determining An Appropriate Sentence for Ian Bick

Since 2005, the United States Supreme Court has consistently stated that the Sentencing Guidelines are advisory only, and, therefore, that a District Court must consider all of the factors set forth in 18 U.S.C. § 3553(a) in a holistic manlier. See *Kimbrough v. United States*, 128 S. Ct. 558 (2007); *Gall v. United States*, 128 S. Ct. 586 (2007); *United States v. Booker*, 125 S. Ct. 738 (2005). Certainly the Guidelines remain "the starting point and initial benchmark" for the sentencing Court, yet the Court "may not presume that the Guidelines range is reasonable." Gall, 128 S. Ct. at 596-97. To the contrary, the Court "must consider all of the § 3553(a) factors to determine whether the   support the sentence requested by a party." Id. That is, the Court "must

sentence based on 18 U.S.0 § 3553(a) without any thumb on the scale favoring a guideline sentence"; *United States v. Roque*, 536 F. Supp. 2d 987, 989 (E.D.Wis. 2008) (quotation marks omitted; citing cases); and impose "individualized justice" for each defendant based on a consideration of all of the factors in § 3553(a). *United States v. Crosby*, 397 F.3d 103, 111-12 (2005).

Although each factor of § 3553(a) must be considered, a District Court must not engage in a mathematical, isolated calculation of each factor. Rather, the Supreme Court "has emphasized that section 3553(a) is more than a laundry list of discrete sentencing factors; it is, rather, a tapestry of factors, through which runs the thread of an overarching principle." *United States v. Rodriguez,* 527 F.3d 221, 228 (1st Cir. 2008). That tenet, the parsimony principle, instructs District Courts to "impose a sentence sufficient, but not greater than necessary" to accomplish the goals of sentencing. See 18 U.S.C. § 3553(a). "In the final analysis, then, the gloss supplied by Kimbrough signifies that a district court should not evaluate a request for a variant sentence piecemeal, examining each section 3553(a) factor in isolation, but should instead consider all the relevant factors as a group and strive to construct a sentence that is minimally sufficient to achieve the broad goals of sentencing." *Rodriguez*, 527 F.3d at 228. "This inquiry should be guided by, but not made unflinchingly subservient to, the concerns expressed in the statute's various sub-parts." Id.  In this case, a holistic examination of all of the § 3553(a) factors strongly favors a non-Guidelines term of probation, together with a lengthy period of supervised release and other conditions imposed by the Court. Such a sentence would be "sufficient, but not greater than necessary," for Ian Bick.

**C.    The History and Characteristics of Ian Bick Counsel Strongly in Favor of A Non-Guidelines Sentence**

Under § 3553(a), the Court must consider Ian Bick's history and characteristics when fashioning an appropriate sentence.

Ian Bick was 17 and 18 when the crimes charged were allegedly committed, that age being really that of a child, not yet coming into adult maturity.  This is his first offense and he has never served time in a correctional facility. He has a strong entrepreneurial spirit and will be a successful member of society. How many people his age could operate a music venue, and gain the respect of the music community?

Section §5H1.1 of the Guidelines states that

> Age (including youth) may be relevant in determining whether a departure is warranted, if considerations based on age, individuality or in combination with other offender characteristics are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines…

As described in The Teenage Brain: How Do We Measure Maturity? From the Association for Psychological Science by Herbert Wray  (3-29-2013), attached as Exhibit B, it is noted that psychological science has a more nuanced view of adolescence between childhood and adulthood, than does the law does in merely setting a line between minors and adults and that

> This view is supported neuroscience, which shows that the frontal cortex – the seat of judgment, self-control and sensible planning – matures very gradually into early adulthood. It is out of sync with the early development of the emotional brain, and as a result there is a gap between early sensation seeking and later self-discipline.

**D.      The Nature and Circumstances of the Offense.**

**1.  The Probation Office's Calculation**

In this case, the Probation Office has calculated that Ian Bick's Guidelines base offense level is 26 (See PSR, ¶32).  The defendant would ask the Court depart downward under the Guidelines. Part of the sentencing Court's task in considering the applicable Guidelines range is to determine whether any grounds for departure exist, in the same manner as before Booker. *United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005), cert denied, 127 S. Ct. 260 (2006). Here, the Court should depart downward from the resulting advisory range because the total offense level substantially overstates the seriousness of his criminal conduct.

**a.   The Court should depart Downward as the Total Offense Level Seriously Overstates the seriousness of the Offense**

The Court should depart downward because the resulting offense level would grossly overstate the seriousness of the offense. §2131.1 App. Note 19. As the commentary to §2131.1 makes clear, however, "[t]here may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted." §2131.1 App. Note 19. Such a departure, provided for in the Guidelines commentary, is thus an encouraged basis for departure under the Guidelines. See *Koon v. United States*, 518 F.3d, 94, 96 (1996); Crosby, 397 F.3d at 112.

Certainly, the defendant's lack of a criminal history and lack of prior periods of incarceration might be a reason for a sentence beneath the Guidelines range. This can be accomplished either by a departure from the Guidelines, or a non- Guidelines sentence.

### b  The Draconian Sentences Called For Under the Fraud Guideline Are Irrational In Their Severity

Professor Frank Bowman, former counsel to the Sentencing Commission, a former federal prosecutor, and a respected commentator on sentencing, has severely criticized the draconian increases imposed by the 2001 and 2003 amendments to the fraud guidelines:

> [I]n fraud cases involving officers of public companies, the Guidelines have become over the past few years an increasingly imperfect measure of an appropriate sentence. For the small class of defendants consisting of corporate officers convicted of fraud offenses associated with very large Guidelines loss calculations, the Guidelines now are divorced both from the objectives of Section 3553(a) and, frankly, from common sense. Accordingly, the Guidelines calculations in such cases are of diminished value to sentencing judges.

Bowman, *High-Loss Corporate Frauds*, 20 Fed. Sent. Rep. at 168. Reviewing the increases to federal fraud guidelines from 1987 to 2007, Professor Bowman concludes that those repeated exponential guidelines increases have produced irrational severity. *Id.* He explains:

> The point of sentencing Guidelines is to give meaningful guidance to sentencing judges by subdividing the universe of possible sentences into ranges and assigning defendants to those ranges based on the presence or absence of relevant factors. A sentencing regime so imprecisely calibrated that it generates sentencing ranges for property crimes from 5 to 14 notches higher than necessary for life imprisonment is useless to a judge attempting to craft sentences in a serious corporate white-collar case. If disposed to take a very stringent view of corporate wrongdoing, one might be able to rationalize a multi-decade term for the very worst-of-the-worst, biggest-of-the-biggest corporate criminal, but under the current Guidelines a corporate officer who presides over a fraud involving securities and a loss of only $2.5 million can qualify for life imprisonment. [34] A system pegged to such extreme levels of severity no longer provides a means of distinguishing between more and less culpable defendants and instead sweeps virtually any significant participant in a large corporate fraud into the same unrealistically punitive category.

*Id.*

As already discussed, courts called upon to apply these draconian Guidelines have found them unhelpful in imposing realistic sentences to punish even serious corporate wrongdoing. Confronted with a securities fraud offense involving a $50 million loss finding, the *Adelson* court found that the applicable Guidelines range ill-fits the situation of someone like the defendant, 441 F. Supp. 2d at 510, and instead illustrated the utter travesty of justice that sometimes results from the guidelines fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense. *Id.* at 512. Professor Bowman notes that even the very highest-profile corporate wrongdoers of our day have all received downwardly varying non-Guidelines sentences. Bowman*, High-Loss Corporate Fraud*, 20 Fed. Sent. Rep. at 169. One such defendant, Jeffrey Skilling, was sentenced within the Guidelines, and that was true only because he was sentenced under the 2000 Guidelines manual before the 2001 and 2003 amendments. *Id.*

This case, and Mr. Bick, are far, far removed from the high-profile frauds and wrong-doers discussed above, all of whom received below-Guidelines sentences.

Though it may be true as a general matter that large losses are more serious than small ones, and that loss is the same from the victims perspective irrespective of defendants personal enrichment, from the standpoint of personal culpability, there is a significant difference. *Ranum*, 353 F. Supp. 2d at 990 (citing *Emmenegger*, 329 F. Supp. 2d at 427-28). The Court should exercise its discretion under *Booker*, *Gall*, and *Kimbrough* to fashion a non-Guidelines sentence, considering all of the § 3553(a) factors, to make an individualized assessment based on the facts presented. *Gall*, 128 S. Ct. at 597.

The Court should grant Ian a non-Guidelines sentence well below the PSR's recommended Guidelines range in light of Mr. Bick's age, history and characteristics of

strong family ties.

### 2. The Remaining §3553 Factors Support a Non-Guidelines Sentence

As mentioned previously, the Court must balance all of the factors set forth in § 3553(a) in order to gain a "holistic" view of an appropriate sentence for Ian Bick. Thus, in addition to the advisory Guidelines ranges, the Court must consider each of the remaining §3553(a) factors in its overarching effort to determine a sentence that is "sufficient, but not greater than necessary," for Ian Bick. In this memorandum, Ian Bick respectfully submits that each factor, whether considered alone or in combination with the other factors, compels a non-Guidelines sentence.

### a. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

Ian Bick's case demonstrates the strong penalties that are associated with wire fraud. In other words, this case demonstrates that the Government will swiftly hold individuals accountable for criminal conduct, as here.

Retribution for engaging in wrongful conduct that is prohibited by law is of course a strong interest in all cases -- a defendant should get a merited response to his deeds. Ian, now only 20, will have a felony conviction against him for the rest of his life. It will have a significant impact on his future employment, travel and possibly relationships.

### b. The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct

No one could look at Ian Bick's situation and conclude that it would be anything but undesirable to pursue the same course of conduct. Indeed, any period of probation and a felony conviction is a significant penalty, especially for an individual such as Ian Bick who is such a respected and hardworking person.

Additionally, courts have recognized considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective white collar offenders. *Adelson*, 441 F. Supp. 2d at 514 (citing Richard Frase, *Punishment Purposes*, 58 Stanford L. Rev. 67, 80 (2005); Elizabeth Szockyj, *Imprisoning White- Collar Criminals?*, 23 S. Ill. U. L.J. 485, 492 (1998)).

### c. The Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant

In determining an appropriate sentence, courts must also consider the need for the sentence to "protect the public from further crimes of the defendant." §3553(a)(2)(C). In Ian Bick's case, the risk of recidivism will be unlikely. Ian Bick does not need to be incarcerated to prevent him from committing future crimes or in order to protect the public.

### d. The Need for the Sentence Imposed to Provide the Defendant With Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner

The Defendant does not require educational or vocational training if incarcerated.

### e. The Goal of Rehabilitation Would Not Be Served By a Jail Sentence

Another factor under §3553(a) is the need for rehabilitation. §3553(a)(2)(D). This is Ian Bick's first criminal arrest or conviction, and rehabilitation is not necessary or appropriate. As the Court stated in *United States v. Carvajal*, "[a] judge should be hesitant before sentencing so severely that she destroys all hope and takes away all possibility of useful life. Punishment should not be more severe that that necessary to satisfy the goals of punishment." No. 04 CR 222(AKH), 2005 WL 476125, at *6 (S.D.N.Y. Feb. 22, 2005). Alternatives to incarceration such

as probation and home confinement  should be explored.

### f.  Ian Bick's History and Characteristics Warrant a Non-Guideline Sentence

After evaluating the Sentencing Guidelines and calculating a potentially applicable Guidelines range, a sentencing court must consider the remaining §3553(a) factors and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth by Congress". _Kimbrough,_ 128 S.Ct. at 570. Sentencing Courts now have the obligation to consider factors that were discouraged under the pre-Booker mandatory Guidelines regime, such as the history and characteristics of the defendant, the likelihood of recidivism, and the public's need for protection, because they are relevant in determining the "history and characteristics" of the defendant" under. §3553(a)(1), e.g. _Kimbrough_, 128 S.CT. at 570.

Ian has no criminal history, which is significant under the Guidelines. "A defendant with a  record of criminal behavior is more culpable than a first offender and thus deserving of greater punishment". U.S.S.G. Ch. 4, Pt. A, intro, comment. The converse then, must be true: a defendant with no history of criminal behavior is deserving of lesser punishment.

### E.    The Types of Sentences Available

### a. Term of Imprisonment

As mentioned, previously, the PSR states at ¶70 that the advisory Guidelines establish a range of imprisonment of 63-78 months (with the various enhancements suggested). Without the enhancements, and with a 10 level increase for loss, the range is 30-37 months.  The defendant seeks a non-Guidelines sentence of probation or other alternative form of incarceration.

### b.  Probation

The defendant is not eligible for probation under the Guidelines (See PSR at ¶74), except under a non-guidelines sentence which is sought here. He is eligible for probation under 18

U.S.C. §3561(c)(1), see PSR ¶73.

### F.    Fine And Restitution

#### a.  Defendant's Finances/Fine

The PSR at ¶76 indicates that the Guideline Range for a fine is $12,500 to $125,000.00 pursuant to U.S.S.G. §5E1.2(c)(3) and §5E1.2(h)(1). Ian Bick represents that he has insufficient assets for a fine, but any available funds should be channeled toward probation.

#### b. Restitution

The Defendant agrees that restitution is appropriate under the MVRA, and he has taken a second job from his entertainment business and has devoted his entire salary toward restitution. Restitution, however, does not the same computations as loss.

### X.    GROUPING ISSUE

A Guidelines sentencing looms like an elephant in the room, being the significance of grouping to the various victims and counts in this case. A mistrial was granted as to Counts 1,3, 4 and 13 after the jury was deadlocked on those counts. All four counts relate to Henry Scozzafava. The Government has yet to indicate whether or not it will retry Ian on those counts, or any of them.

The pragmatic issue raised here is one of fairness: Ian is being sentenced based upon the jury verdicts as to several "victims", and each of the Counts relating to those victims are "grouped", that is, Ian doesn't receive a separate sentence as to each count.

Consequently, if Ian is retried on the four mistried counts and found guilty on any or all of them, he will have already been sentenced in this cases and the "new" charges cannot be grouped for sentencing purposes. Hence he would receive a higher sentence, or additional time, for the second case being deprived of the Guidelines grouping rules.

26

The Guidelines defines the concept as follows:

### §3D1.2.    Groups of Closely Related Counts[10]

All counts involving substantially the same harm shall be grouped together into a single Group.  Counts involve substantially the same harm within the meaning of this rule:

(a)    When counts involve the same victim and the same act or transaction.

(b)    When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.

(c)    When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.

(d)    When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

In *United States v. Mizrachi*, 48 F.3d 651, 654 (2d cir. 1995), the Second Circuit has described grouping as an improvement on the pre-guidelines sentencing era, because it establishes "a sensible middle ground between completely concurrent and completely consecutive sentences" for multiple counts of conviction.

For these reasons, Ian's sentencing ought to be deferred until the Government's intentions as to a resentencing are made known.

---

[10] The Application Notes make it clear that grouping applies to charges involving multiple victims as to sections (c )  or (d). See *United States v. Napoli*, 179 F.3d 1, 7 (2d cir, 1999).

### X.     CONCLUSION

As noted by the Second Circuit in *U.S. v. Crosby*, 397 F.3d 103 (2d Cir 2005), a sentencing court is required to consider the applicable Guidelines and can impose a sentence within the Guideline structure or can impose a non-Guidelines sentence.

District Judges are now afforded "wide latitude to impose non-Guidelines sentences based on case-specific applications of the §3553(a) factors. *United States v. Cavera*, 505 F.3d at 225, noting a sentence in *United States v. Jones*, 430 F.3d 191, 194 (2d Cir. 2006), where the district court imposed a sentence that was 50 percent below the bottom of the Guidelines range based on the judge's "gut feeling" about the defendant and his findings on his personal circumstances.

Interestingly, the Government asks the Court to return to the pre-*Booker* sentencing era (pp. 58-59 of its Memo), calling for a faithful return to Guidelines sentencing and misreading Second Circuit cases as calling for a reliance on the Guidelines Ranges for sentencing. That boat has sailed some time ago, and the Court needs to rely upon §3553(a) in imposing a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing.

Ian's post-judgment of traveling to New York to a gambling casino was an event of immaturity and he regrets that conduct. His age in that regard, as well as in the facts of this case plays a major role in explaining his conduct, although certainly doesn't justify it.

He respectfully asks the Court, exercising its post-*Booker* discretion, to impose an individualized sentence that reflects the unique circumstances of this case, acknowledges his age, his history and characteristics, and permits him to return to be a productive member of society.

Alternatives to incarceration would be appropriate for Ian, and he respectfully suggests that

probation or home confinement are appropriate alternative sentences [11].

Respectfully submitted,

IAN BICK

*/s/ Jonathan J. Einhorn*
JONATHAN J. EINHORN
129 WHITNEY AVENUE
NEW HAVEN, CT. 06510
203-777-3777
Fed. Bar No. ct00163
einhornlawoffice@gmail.com

## **CERTIFICATION**

I hereby certify that on this 15th day of September, 2016, a copy of the foregoing
Memorandum was filed electronically and served by mail on anyone unable to accept electronic
filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's
electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the
Notice of Electronic Filing.  Parties may access this filing through the Courts CM/ECF System.

/s/ Jonathan J. Einhorn
JONATHAN J. EINHORN

---

[11] The Government's comment at page 62 of its sentencing memo, warning the Court against
imposing a "proverbial slap on the wrist and an order not to do it again" is difficult to fathom
under the realities of  sentencing under §3553(a) in 2016, but harkens back to a long bygone pre-
*Booker* era. Is this a blanket response by the Government as to the use of probation as a
sentencing tool?

29